**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

Antwaun Tucker

v. Civil No. 22-cv-525-SM–AJ

Cheshire County Jail. et al.[1]

## REPORT AND RECOMMENDATION

Self-represented Plaintiff Antwuan Tucker filed this action, pursuant to 42 U.S.C. § 1983, asserting claims of excessive force in violation of the Fourteenth Amendment, and state law tort claims of assault, battery, and negligence, arising out of events that occurred on March 8, 2022, while Mr. Tucker was detained pretrial at the Cheshire County House of Corrections ("CCHC"). See Third Am. Compl. (Doc. No. 21) ("TAC"); see also Compl. Addenda (Doc. Nos. 1, 5, 6). Presently before the court, for a Report and Recommendation as to disposition, is Defendants' Motion for Summary Judgment (Doc. No. 45), and Mr. Tucker's Objection (Doc. No. 49) thereto.

## Summary Judgment Standard

"[T]he role of summary judgment is 'to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" J.S.H. v. Newton, 164 F.4th 142, 148 (1st Cir. 2026) (citation omitted). The court appropriately grants summary judgment "only if the undisputed material facts, taken 'in the light most

---

[1] The defendants in this case are Cheshire County, and the following Cheshire County House of Corrections employees: Major James Erwin, Command Sergeant Major Zachery Brown, Master Sergeant Hunter McDonald, and Corrections Officers Michael Tocci and Alfred Beyer.

favorable to' [the non-moving party], demonstrate that the [moving party] is entitled to judgment as a matter of law." Walsh v. HNTB Corp., 169 F.4th 330, 338 (1st Cir. 2026); see also Fed. R. Civ. P. 56(a).

"A genuine dispute is one where the evidence is such that a reasonable jury could resolve the point in [the nonmovant's favor] and a material fact is, as the name suggests, a fact that has the potential of affecting the outcome of the case." John B. Cruz Constr. Co. v. Beacon Cmtys. Corp., 169 F.4th 89, 95 (1st Cir. 2026) (internal quotation marks and citations omitted). The party moving for summary judgment has the initial burden to identify evidence showing that there is no genuine dispute of material fact. See Hamdallah v. CPC Carolina PR, LLC, 91 F.4th 1, 17 (1st Cir. 2024).

The party opposing summary judgment "must, with respect to each issue on which it would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in its favor." Hebert v. Donahue, 167 F.4th 1, 14 (1st Cir. 2026) (internal quotation marks and citation omitted). However, the party opposing summary judgment "cannot rely on conclusory allegations, improbable inferences, . . . or rank speculation." Doe v. City of Boston, 165 F.4th 630, 636 (1st Cir. 2026) (internal quotation marks and citations omitted).

That said, "[c]ourts reviewing a summary judgment motion must not weigh the evidence." Mullen v. Dep't of Corr., 800 F. Supp. 3d 250, 262 (D. Mass. 2025) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)). Therefore, "district courts are 'not free to weigh the parties' evidence or the reasonable inferences that might be drawn from that evidence by the jury.'" Pérez-Pérez v. Hosp. Episcopal San Lucas, Inc., 113 F.4th 1, 8 (1st Cir. 2024) (citations omitted).

Thus, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007). Where, as here, the record includes "a videotape capturing the events in question," the court should "view[] the facts in the light depicted by the videotape." Id. at 378. If unaltered video evidence contradicts the plaintiff's allegations, the "normal factual solicitude for the nonmovant at summary judgment [is] both unnecessary and inappropriate." Lash v. Lemke, 786 F. 3d 1, 6-7 (D.C. Cir. 2015); see also Medina-Rivera v. MVM, Inc., 713 F.3d 132, 136 (1st Cir. 2013) (summary judgment court "need not accept [the plaintiff's] version of events if it is 'blatantly contradicted' by the evidence." (citation omitted)).

Applying this standard, the court sets forth the facts upon which it relies in making its recommendation as to the disposition of Defendants' motion.[2] Those facts are taken from the summary judgment record in this case.[3]

---

[2] The "facts" recounted in this Report and Recommendation are only established facts for purposes of summary judgment. See Miller v. Jackson, 152 F.4th 258, 261 n.2 (1st Cir. 2025). The facts set forth here are undisputed for purposes of summary judgment, unless otherwise noted.

[3] The summary judgment record in this case consists of: Mr. Tucker's Verified Complaint documents (Doc. Nos. 1, 5, 6, 21); the attachments to Defendants' Motion for Summary Judgment; the conventionally filed videos (Doc. No. 48); and Mr. Tucker's Objection.

## **Background**

I. CCHC's F Block Layout

The events that underlie Mr. Tucker's claims in this action took place on CCHC's F Block. Declaration of Nicholas Phillips (Doc. No. 45-2) ("Phillips Decl.") ¶ 13. F Block has two levels: a lower level consisting of a common area with tables, a few cells, an officer's desk, and at least one office, and an upper level, which is comprised of a walkway and multiple cells along the back wall and (from the vantage point of one facing the back wall) along the right wall. See id.; Photograph of F Block (Doc. No. 45-8). The upper level can be accessed by a central staircase that connects the approximate center of the lower level common area to the middle of the back wall, and by a second staircase located outside of the housing unit itself, which opens onto the right side of F Block's upper level. Phillips Decl. ¶ 13; see also 81 FBLOCK Video (Doc. No. 48)[4] at 2:07:54.

II. March 8, 2022 Events

On March 8, 2022, Mr. Tucker was detained at the CCHC while awaiting trial. See Phillips Decl. ¶ 10; Nov. 14, 2025 Dep. of Antwaun Tucker ("Tucker Dep.") at 16. On that day, Mr. Tucker and a number of other CCHC inmates were transferred to F Block so that repairs could be made to K Block, where they had been housed previously. See TAC, at 5; Phillips Decl. ¶ 12. As part of the transfer process, CCHC Corrections Officers ("COs") screened the transferred inmates' personal belongings.

[4] Defendants conventionally submitted, with their summary judgment motion, digital copies of three videos recorded by stationary cameras located in F Block. See Doc. No. 48. Consistent with the names of the digital files, those videos are identified here as "76 FBLOCK Video," "80 FBLOCK Video," and "81 FBLOCK Video." See Phillips Decl. ¶ 17.

See TAC, at 5; Phillips Decl. ¶ 15. After that screening, Mr. Tucker and other inmates noticed that some of their personal belongings were missing, and believed that the officers had discarded those items. See TAC, at 5; Phillips Decl. ¶ 16; Tucker Dep., at 23.

At 2:02 p.m. on March 8, 2022, Mr. Tucker joined several other inmates, including Kassim Marsh and Juan Navarro, who were standing near the top of the center stairs. 76 FBLOCK Video 2:02:32. At that time, the inmates at the top of the center staircase were speaking with officers who were on the lower level; the inmates were asking to speak with the Captain regarding their missing items. TAC, at 5.

At approximately the same time, one or more officers called for the inmates to "lock in" to their cells for headcount, an event which occurred at or around 2:00 p.m. each day. Decl. of Matthew Heath (Doc. No. 45-11) ("Heath Decl.") ¶ 3.[5] Mr. Tucker

[5] When CCHC officers order inmates to "lock in," inmates are supposed to go into their cells for headcount. See Heath Decl. ¶¶ 3-4 ("At approximately 2:00 PM that day, officers called out for a headcount, which is conducted at that time every day to confirm that all inmates are present and accounted for. During headcount all inmates are required to return to their cells."); Tucker Dep., at 27. The record of this case does not make clear exactly when or how often officers instructed the F Block inmates to "lock in" on March 8, 2022. Compare Tucker Dep., at 27 (averring that inmates had already asked officers on F Block to call a Captain concerning their property items before officers directed the inmates to "lock in.") and Compl. (Doc. No. 1), at 8 ("On March 8, 2022 three inmates and myself refused to lock-in due to the fact we requested to talk to a Captain about items that we were missing from our belongings." (cleaned up)); with, e.g., Decl. of Randy Hall (Doc. No. 45-12) ("Hall Decl.") ¶ 8 ("Officers repeatedly ordered the inmates, including Plaintiff, Navarro, and [Kassim and Jahlil Marsh], to return to their cells for [headcount]."); Decl. of Michael Thompson (Doc. No. 45-14) ¶ 6 ("When I arrived [on F Block on March 8, 2022], I could see a number of inmates on the upper tier who were refusing to lock in and arguing with the officers who were present."); Decl. of James Erwin (Doc. No. 45-15) ¶¶ 6-7 ("As we entered the upper tier, we walked rapidly towards the top of the central staircase, instructing the inmates to get on the ground and/or to go to their cells and lock in. Plaintiff Antwaun Tucker did neither."); Decl. of Zachery Brown (Doc. No. 45-17) ¶ 6 ("As we entered the tier, inmates

concedes that he heard the order to "lock in" for head count, at least once, and did not follow that order. Tucker Dep., at 30. When multiple inmates did not comply with the officers' order to "lock in," CO and F Block Dayroom Manager Matthew Heath called his supervisor, Command Sergeant Major ("CSM") Gregory Koziara, who "called for backup." Heath Decl. ¶¶ 2, 5. Less than a minute later, more than twenty officers (which included officers working that day, and others who were at the CCHC for a training exercise) arrived at the bottom of the center staircase. See Phillips Decl. ¶ 4; 76 FBLOCK Video 2:03:53–2:04:28.

The ensuing events are almost entirely visible on the 76 FBLOCK and 81 FBLOCK Videos.[6] See Phillips Decl. ¶ 17. The time stamps listed in the left column below, and description in the right column, are taken from the 76 FBLOCK Video. Time stamps and descriptions from the 81 FBLOCK Video are also noted, in brackets, where they show an event in greater detail than is visible on the 76 FBLOCK Video. Additionally, where other documents or exhibits in the record of this case are relevant to the events described, those items are noted in italics under the right-column entries. The identity of particular inmates is taken from a photograph (Doc. No. 45-6), submitted as an exhibit to Defendants' summary judgment motion, picturing the inmates and identifying them by name. See Phillips Decl. ¶ 18.

2:01:06 Mr. Tucker is walking up the F Block center staircase.

---

that were along the corridor moved back towards the center staircase, refusing orders to . . . lock in.").

[6] The court notes that Mr. Tucker has viewed the videos and does not here contest their accuracy. The court further notes that the videos do not include sound, and thus do not clarify precisely what any particular individual said.

2:01:39 After pausing and turning around three steps short of the upper level, Mr. Tucker arrives at the upper level

2:02:02 Mr. Tucker and Mr. Navarro are standing at the top of the center staircase looking down the stairs. Mr. Tucker then moves a short distance, toward the right side of the upper level.

2:02:42 – 2:03:20 Kassim Marsh goes to a mop bucket near the top of the center staircase, gets a mop handle, and joins Mr. Navarro at the top of the center stairs.

2:03:11 – 2:03:35 Mr. Tucker walks slowly to the right side of the upper level.

*Mr. Tucker's cell on F Block was located on the right side of the upper level. See Tucker Dep., at 30.*

2:03:30 – 2:03:53 Jahlil Marsh retrieves a mop handle from a mop bucket on the lower level of the unit and walks up the center staircase.

2:03:55 – 2:07:17 At least twenty CCHC officers gather on the lower level of F Block. Most of the officers are gathered near the bottom of the center staircase, and it appears that a verbal exchange is occurring between the inmates at the top of the stairs, and the officers at the bottom of the stairs. During this time (2:04:04 – 2:04:16), Mr. Tucker walks from the right side of the upper level toward the center staircase. Kassim and Jahlil Marsh are standing at the top of the center stairs holding mop handles. Mr. Navarro and Mr. Tucker are empty-handed. Mr. Navarro is standing beside Kassim and Jahlil Marsh to the left. Mr. Tucker is standing several feet behind the Marshes, to the right.

[Mr. Tucker appears to participate briefly in the verbal exchange between the officers and the inmates. See 81 FBLOCK Video at 2:05:24 – 2:05:31, 2:06:14 – 2:06:27, 2:07:07 – 2:07:20.]

*According to Mr. Tucker's deposition testimony, when the officers were gathering at the bottom of the center staircase, Kahlil Marsh "was explaining to them what was going on. [Kahlil Marsh] was trying to get to the root of the problem, to explain the issue." Tucker Dep., at 35. Captain Randy Hall, who had arrived on the unit "was listening" to the inmates, and "pretty much trying to diffuse the situation." Id.; see also TAC, at 6.*

2:06:29 Jahlil Marsh walks away from the staircase to the left side of Mr. Navarro, and continues to speak with the officers.

2:06:46 Mr. Tucker walks away from the center staircase toward the right side of the upper level.

2:06:52 Two officers start to go up the center staircase and Mr. Tucker takes a few steps back toward the top of the center stairs.

2:06:56 Kassim Marsh hands the mop handle he was holding to an unidentified inmate who comes to the top of the stairs, holds it for a few seconds, and leans it against the upper level railing.

[See 81 FBLOCK (2:06:54 – 2:07:03)].

2:07:05 Additional officers begin to ascend the center staircase and pause.

*Mr. Tucker testified that Kassim Marsh put the mop handle down at Capt. Hall's request. Tucker Dep. at 36; TAC, at 6.*

2:07:15 The two officers who went up the staircase start to back down the staircase.

2:07:30 Mr. Tucker walks from the area of the center stairs toward the right side of the upper level and stands with two other inmates on the right side of the upper level. There is a verbal exchange between the Marshes, Mr. Navarro, and another unidentified inmate at the top of the center staircase, and the officers on or near the bottom of that staircase. Two additional inmates are standing in cell doors on the back side of the upper level.

2:07:52 – 2:08:15 A group of approximately ten officers quickly ascends the right side staircase onto the right side of the upper level and proceeds quickly toward Mr. Tucker, Jahlil Marsh, and an unidentified inmate on the right side walkway. The officer in the front of that group is holding an object in front of him which he appears to be pointing at Mr. Tucker and the other two inmates. Mr. Tucker and the other two inmates are essentially herded along the upper level toward the center staircase. At the same time, a group of at least eleven officers quickly walks up the center staircase. Officers appear to direct the inmates standing in cell doors to go into their cells. The press of the two groups of officers causes Mr. Tucker, the other two inmates standing on the right upper level, and the four inmates who were standing at the top of the center staircase, to move along the walkway toward the left of the center staircase. Jahlil Marsh puts down the mop handle he was holding. Mr. Tucker and an officer

appear to be speaking or yelling at one another and pushing one another's hands.

[See 81 FBLOCK Video 2:08:04, 02:08:14.]

*See also Tucker Dep., at 33 (describing "second gang" of officers coming up the center staircase pointing tasers at the inmates and yelling for the inmates to get on the ground, and stating that at the time the officers were coming up the stairs, there "was a bunch of yelling going on at the moment, and [the officers] were requesting for us to get – get on the floor. And I was telling them I'm not getting on the floor."); Decl. of Michael Thompson (Doc. No. 45-14) ("Thompson Decl.") ¶¶ 10-11 ("As [the officers] entered, [they] shouted at the inmates to get on the ground. Mr. Tucker did not do so, nor did he enter his cell. Instead, he moved away from [the officers] to the top of the center staircase."); id. ¶ 13 ("Officers – including me specifically – continued to tell the men – including Mr. Tucker – to get on the ground, and they continued to refuse."); Decl. of James Erwin (Doc. No. 45-15) ("Erwin Decl.") ¶¶ 6-7 ("As we entered the upper tier, we walked rapidly towards the top of the central staircase, instructing the inmates to get on the ground and/or to go to their cells and lock in. Plaintiff Antwaun Tucker did neither. As we reached the top of the center staircase, the inmates and officers were in close contact and Mr. Tucker, Kassim Marsh, Jahlil Marsh, and Juan Navarro still refused to comply with our orders."); Decl. of Zachery Brown (Doc. No. 45-17) ("Brown Decl.") ¶ 6 ("As we entered the tier, inmates that were along the corridor moved back towards the center staircase, refusing orders to get on the floor or lock in.").*

2:08:16 An officer, later identified as Major James Erwin, appears to discharge Oleoresin Capsicum ("OC") spray in Mr. Tucker's direction, and Mr. Tucker tries to turn his head to the right, away from the OC spray.[7] Two officers try to grab hold of Mr. Tucker. Mr. Tucker struggles with the officers, then pulls away and runs toward the left side of the back walkway.

[See 81 FBLOCK Video 2:08:16 – 2:08:19.]

*See Erwin Decl. ¶ 8 ("At that time, I tried negotiating with the inmates in question to put down their weapons and comply with*

---

[7] While the liquid pepper spray itself is not visible on the video, it is undisputed that Major Erwin sprayed Mr. Tucker and Kassim Marsh at that time. See Tucker Dep. at 40; Erwin Decl. ¶ 8.

*orders. They retreated then advanced towards us. With my training and experience I felt an attack was eminent [sic], so I elected to administer the OC spray directed at Mr. Tucker and K. Marsh, as they were the aggressors."); id. at ¶¶ 9, 11 ("The purpose of utilizing the spray was to reduce the inmate's ability to see us and, we hope, thereby reduce their ability to injure us. . . . The use of the OC spray was consistent with my training and experience. It had the desired effect on Kassim Marsh. However, as I attempted to grab hold of Mr. Tucker, he shoved me and ran further along the upper tier.").*

*See Tucker Dep., at 43 (Mr. Tucker testified that he "pushed off" an officer because the OC spray rendered him unable to see who was in front of him); see also TAC, at 7.*

2:08:22 An officer pushes Jahlil Marsh down on top of a mop bucket and onto the floor; as Jahlil Marsh is going to the floor, he falls against Mr. Tucker's right leg as Mr. Tucker continues to try to move to the left side of the upper level. At the same time, CO Michael Tocci shoots the prongs of his taser into Mr. Tucker's back, and then deploys his taser, sending an electric shock into Mr. Tucker. Mr. Tucker immediately falls straight down onto his back.

[See 81 FBLOCK 2:08:21 – 2:08:23.]

*See Tucker Dep., at 45 (Mr. Tucker testifies that he fell "straight back on [his] back" when he was tased, not when Jahlil Marsh fell against his right leg); TAC, at 8 (averring that when Jahlil Marsh fell he hit the back of Mr. Tucker's right leg); id. at 9; see also Decl. of Michael Tocci (Doc. No. 45-18) ("Tocci Decl.") ¶¶ 6-8 ("At the time I fired the Taser, Plaintiff had refused to lie on the ground as commanded, had physically resisted detention by [James] Major Erwin, and was still upright and seemingly pulling away from [CO Alfred] Beyer and [CSM Zachery] Brown. This took place before or just as inmate Jahlil Marsh crashed into his leg and before Beyer and Brown had control of him. The Taser was effective and Plaintiff fell to the ground on [sic], landing on his back.").*

2:08:28 It appears that two officers, later identified as CSM Brown and CO Beyer, are on their knees, positioned on either side of Mr. Tucker's upper body and somewhat leaning over Mr. Tucker. Mr. Tucker is lying on his back.[8]

---

[8] The 76 FBLOCK Video does not reveal what CSM Brown and CO Beyer are doing with their hands while they are kneeling beside Mr. Tucker's prone body. It is undisputed, however, that the officers were, at that time, handcuffing Mr. Tucker's wrists

*See Decl. of Alfred Beyer (Doc. No. 45-16) ("Beyer Decl.") ¶ 9 ("When Mr. Tucker fell, he landed on his back. We rolled him onto his stomach."); Brown Decl. ¶ 19 ("When Mr. Tucker fell, he landed on his back. We rolled him onto his stomach to handcuff him.")*

*See TAC, at 9 (Once CO Tocci stopped tasing him, Mr. Tucker "was given commands to follow which he complyed [sic]." CSM Brown and CO Beyer then placed Mr. Tucker in handcuffs). But see Tucker Dep. at 46 (agreeing that CSM Brown and CO Beyer rolled Mr. Tucker onto his stomach to handcuff him behind his back).*

2:08:33 While CSM Brown and CO Beyer are handcuffing Mr. Tucker, Master Sgt. Master Hunter McDonald moves toward Mr. Tucker's feet and appears to be standing, crouching, or kneeling in the vicinity of Mr. Tucker's legs. Mr. Tucker does not appear to be moving. The parties do not dispute that, while Mr. Tucker was lying on his stomach being handcuffed, Master Sgt. McDonald crossed Mr. Tucker's legs, and pushed Mr. Tucker's crossed ankles toward Mr. Tucker's buttocks, bending Mr. Tucker's knees.[9]

*See Tucker Dep., at 47-48 (identifying Master Sgt. McDonald as the individual who "got on [his] legs and pushed them down" and "broke my leg" when he was "already in cuffs."); id. at 54-55 ("I feel like when they were holding me down – when [Master Sgt. McDonald] grabbed my legs, there was – I wasn't – at that moment, I wasn't acting erratic. I wasn't resisting. So there was really no need for him to grab my legs and take the actions that he took."); TAC, at 9 ("While [CSM Brown and CO Beyer] are still holding the Plaintiff down, out of nowhere [Master Sgt. McDonald] came and grabbed the Plaintiff by the ankles, crossed [Mr. Tucker's] legs over one another and applied pressure pushing the Plaintiff's feet towards his butt. Immediately a great amount of pain shot through [Mr. Tucker's] leg." (cleaned up)); Decl. of Hunter McDonald (Doc. No. 45-19) ("McDonald Decl.") ¶¶ 5-6 ("I noticed Officers Beyer and Brown attempting to handcuff Plaintiff Antwaun Tucker. I went to assist them by taking control of Mr. Tucker's legs so that he could*

behind his back. See Decl. of Alfred Beyer (Doc. No. 45-16) ¶ 9; Brown Decl. ¶ 19; TAC, at 9.

[9] As discussed in more detail below, the parties dispute the amount of force Master Sgt. McDonald used at that time, and whether Master Sgt. McDonald's actions were necessary to subdue Mr. Tucker.

*not kick out at anyone. By this point, Mr. Tucker was lying on his stomach.").*

2:08:44 It appears that CSM Brown and CO Beyer complete handcuffing Mr. Tucker behind his back. Mr. Tucker is lying still on his stomach.

2:08:47 Master Sgt. McDonald stands up and lets go of Mr. Tucker's legs.

*See McDonald Decl. ¶ 9 ("As soon as Mr. Tucker was secured in handcuffs I released his legs and he was assisted to a sitting position.").*

2:08:50-02:09:23 The video recordings do not provide a full view of Mr. Tucker, but he appears to try to begin to turn onto his right side, and is assisted to his side by CSM Brown and CO Beyer. CSM Brown and CO Beyer then assist Mr. Tucker into a seated position against the back wall.

See Brown Decl. ¶ 13 ("Once Mr. Tucker was handcuffed we sat him up against the wall."); Beyer Decl. ¶ 12 ("Once Mr. Tucker was handcuffed we sat him up against the wall.").

2:09:50 Officers pull Mr. Tucker to his feet and assist him toward and down the stairs and off of F Block. Mr. Tucker is bent forward and does not appear to be able to bear weight on his right leg.

At some point during the encounter between the inmates and officers described above, Mr. Tucker's leg was broken. The undisputed evidence in the record demonstrates that once he was removed from F Block, Mr. Tucker was seen by a CCHC nurse, and was then transported to the Cheshire Medical Center ("CMC") to be seen for his leg injury. See TAC, at 11. After an X-ray and a CT scan, a provider at the CMC determined that Mr. Tucker's leg was broken and would need surgical repair in five to seven days, once the swelling in his leg subsided. See Tucker Dep. at 53; TAC, at 11. At the CMC, Mr. Tucker was placed in a full leg cast and returned to the CCHC. Id. The following day, Mr. Tucker was transferred to the Sullivan County House of Corrections ("SCHC") to await trial. See Tucker Dep. at 53; TAC, at 12. While housed

at the SCHC, Mr. Tucker had surgery the Dartmouth Hitchcock Medical Center in Lebanon, New Hampshire.

The parties dispute how and when Mr. Tucker's leg was broken. Mr. Tucker asserts that Officer MacDonald broke his leg while manipulating his legs as Mr. Tucker lay on the ground, already handcuffed. See Tucker Dep. at 47-48. Defendants have submitted to the court an expert witness report opining that Mr. Tucker's leg broke when Jahlil Marsh tripped over the mop bucket and fell against Mr. Tucker. See Decl. of Dr. Andrew Schoenfeld (Doc. No. 45-21) ("Schoenfeld Decl.") ¶ 6 (summarizing Dr. Andrew J. Schoenfeld's Report setting forth his opinion that, "to a reasonable degree of medical certainty, that the inmate colliding with Mr. Tucker's right leg was the cause" of Mr. Tucker's broken leg); Jan. 13, 2026 Report of Dr. Andrew J. Schoenfeld (Doc. No. 45-22).

## Discussion

### I. Claims and Summary Judgment Arguments

The following claims remain in this action: (1) a Fourteenth Amendment excessive force claim against Major Erwin for his use of OC spray against Mr. Tucker[10]; (2) a Fourteenth Amendment excessive force claim and a state law tort claim for assault and battery, against CO Tocci for tasing Mr. Tucker and against Cheshire County under theory of respondeat superior; and (3) Fourteenth Amendment excessive force claims

[10] In the TAC, Mr. Tucker identified his excessive force claims as arising under the Eighth Amendment, as applied to the States through the Fourteenth Amendment. Because Mr. Tucker was a pretrial detainee at the time of the events underlying this suit, his excessive force claims arise under the Due Process Clause of the Fourteenth Amendment. See Miranda-Rivera v. Toledo-Dávila, 813 F.3d 64, 70 (1st Cir. 2016) (citing Kingsley v. Hendrickson, 576 U.S. 389, 396-97 (2015)).

and state law tort claims for negligence, against CSM Brown and CO Beyer for forcibly holding Mr. Tucker down on his stomach after he said he could not breathe, and against Master Sgt. McDonald for crossing Mr. Tucker's ankles, then pushing Mr. Tucker's feet toward his buttocks, and applying significant weight on top of his crossed legs, causing Mr. Tucker's leg to break. See TAC, at 14-15. Defendants now seek summary judgment on each of those claims.

Defendants argue that the court should grant summary judgment in their favor on Mr. Tucker's Fourteenth Amendment excessive force claims, asserting that, as to each of those claims, the undisputed facts in the record demonstrate that the force Defendants used against Mr. Tucker was objectively reasonable under the circumstances and, therefore, did not violate the Fourteenth Amendment. In the alternative, Defendants assert that they are entitled to judgment in their favor on Mr. Tucker's Fourteenth Amendment excessive force claims under the doctrine of qualified immunity. Finally, Defendants argue that they are entitled to judgment on Mr. Tucker's state law tort claims on the basis that the Defendant officers' use of force was justified under the circumstances existing at the time it was applied, rendering the officers immune from liability under state law; and that nothing in the record supports Mr. Tucker's assertion that Cheshire County is liable to him based on the conduct of its employees.

## II. Legal Standards

### A. Fourteenth Amendment Excessive Force

To state a Fourteenth Amendment claim based on corrections officers' use of excessive force on a pretrial detainee, such detainee must allege facts to show "that the

force purposely or knowingly used against him was objectively unreasonable." Kingsley v. Hendrickson, 576 U.S. 389, 397 (2015). The objective reasonableness of the force used in a particular case is evaluated based on "the facts and circumstances" of that case. Id. (internal quotation marks and citation omitted). Those circumstances, commonly referred to as the "Kingsley factors," include:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the office; and whether the plaintiff was actively resisting.

Kingsley, 576 U.S. at 397; see also Lombardo v. City of St. Louis, 594 U.S. 464, 467 (2021). The analysis of the Kingsley factors proceeds from "the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." Kingsley, 575 U.S. at 397 (citing Graham v. Connor, 490 U.S. 386, 396 (1989)).

As relevant here, when evaluating whether the force used by a corrections officer against a pretrial detainee was excessive, "if the officer's action served a legitimate nonpunitive governmental purpose, then the inquiry focuses on whether the force used was excessive in relation to that purpose." Bolin v. Wilkins, 174 F.4th 1085, 1090 (8th Cir. 2026) (citing Kingsley, 576 U.S. at 398). "In a jail, a legitimate nonpunitive governmental purpose includes preserving internal order by dealing with an actively resisting detainee." Bolin, 174 F.4th at 1090 (citing Kingsley, 576 U.S. at 397). "A court also considers the need for jail officials to adopt and execute 'policies and practices' that in their 'judgement' are necessary 'to preserve internal order and security.'" Kingsley, 576 U.S. at 397 (quoting Bell v. Wolfish, 441 U.S. 520, 547 (1979)).

B. Qualified Immunity

"Government officials enjoy qualified immunity from suit under [42 U.S.C.] § 1983 unless their conduct violates clearly established law." Zorn v. Linton, 607 U.S. 568, 571 (2026) (per curiam). Thus, the Defendants here are entitled to summary judgment on Mr. Tucker's claims, even if they violated Mr. Tucker's constitutional rights, unless Mr. Tucker can demonstrate that the rights Defendants violated were clearly established at the time they engaged in the conduct underlying Mr. Tucker's claims. See Cintron v. Bibeault, 148 F.4th 37, 47 (1st Cir. 2025); Ashcroft v. al-Kidd, 563 U.S. 731, 743 (2011) (qualified immunity doctrine provides public officials "breathing room to make reasonable but mistaken judgments about open legal questions"). "However, 'qualified immunity does not shield public officials who, from an objective standpoint, should have known that their conduct was unlawful.'" Mullen, 800 F. Supp. at 263 (quoting Haley v. City of Boston, 657 F.3d 39, 47 (1st Cir. 2011)).

To determine whether a defendant is entitled to qualified immunity, the court utilizes a two-part test:

> First, "the court must determine whether the plaintiff's version of the facts makes out a violation of a protected right." Second, the court must determine "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." The second step itself has two sub-parts. Sub-part one requires the plaintiff to "identify either 'controlling authority' or a 'consensus of cases of pervasive authority' sufficient to signal to a reasonable [official] that particular conduct would violate a constitutional right." Sub-part two requires us to consider "whether a reasonable [official] in the defendant's position would have known that his conduct violated the established rule." "These inquiries are carried out with the understanding that qualified immunity is meant to shield 'all but the plainly incompetent or those who knowingly violate the law.'"

Norton v. Rodrigues, 955 F.3d 176, 184 (1st Cir. 2020) (internal citations omitted).

III. Claim 1 (Major Erwin's Use of OC Spray)

Mr. Tucker alleges that Major Erwin deployed OC spray against him in a manner and under circumstances which amounted to an objectively unreasonable and excessive use of force, in violation of the Fourteenth Amendment. Defendants argue that the undisputed evidence in the summary judgment record demonstrates that Major Erwin's use of OC spray against Mr. Tucker was justified and proportional to the situation, and objectively reasonable under the circumstances.

Courts have held that the use of OC spray was a reasonable response to a situation in which a pretrial detainee involved in an altercation with another inmate failed to stop fighting despite "verbal and physical commands to stop," where the altercation was occurring in a common area of the jail where other inmates were present, and "could have spread to the other inmates . . . present." Robison v. Testa, No. 1:20-CV-00263-RAL, 2021 WL 5770211, at *4, 2021 U.S. Dist. LEXIS 232580, at *10-11 (W.D. Pa. Dec. 6, 2021) (officer's "verbal commands proved inadequate to stop the violence," so the "decision to escalate to the use of [pepper] spray was objectively reasonable"); see also Segura v. Cherno, No. 6:21-CV-0740-YY, 2022 WL 3587860, at *7, 2022 U.S. Dist. LEXIS 150888, at *21 (D. Or. May 25, 2022) ("a limited amount of pepper spray used by officers to break up a fight is both justified and proportional, considering the need for force and jail 'policies and practices needed to maintain order and institutional security'" (quoting Kingsley, 576 U.S. at 399-400)), R&R adopted, 2022 WL 3586721, 2022 U.S. Dist. LEXIS 150011 (D. Or. Aug. 22, 2022); Beauvoir v. Falco, 345 F. Supp. 3d 350, 369 (S.D.N.Y. 2018) (granting § 1983 defendants summary judgment because the "use of the pepper spray . . . was permissible in the context of needing to maintain a

baseline of order in the prison system," where "Plaintiff repeatedly resisted multiple officers' orders").

As to the Kingsley factors, the court finds that the undisputed evidence shows that Major Erwin's response to an altercation between inmates and officers that was escalating from a verbal dispute to a physical confrontation, was limited to a single deployment of OC spray. Mr. Tucker does not assert that, other than the initial pain from the spray, Major Erwin's actions injured him. Further, the parties agree that prior to Major Erwin's use of OC spray, officers attempted on more than one occasion to de-escalate the confrontation by verbally ordering the inmates to return to their cells, and when that order was ignored, to lie on the ground, but the inmates, including Mr. Tucker, refused to comply with those commands. Additionally, the undisputed evidence before the court shows that numerous inmates were involved in the dispute with officers, and that the confrontation occurred in F Block's common area where other inmates were present.

Accordingly, the undisputed facts in the summary judgment record before the court demonstrate that Major Erwin's use of OC spray on March 8, 2022, was objectively reasonable under the circumstances then present, as those circumstances would have reasonably appeared to Major Erwin. The court finds, therefore, that Major Erwin is entitled to judgment as a matter of law as to the Fourteenth Amendment excessive force claim identified in this case as Claim 1. Accordingly, the district judge should grant Defendants' motion for summary judgment on that claim.[11]

[11] Because the court finds that Major Erwin did not violate the Fourteenth Amendment when he used OC spray on Mr. Tucker, the court need not address whether Major Erwin is entitled to qualified immunity on that claim. See Flowers v.

IV. Claim 2 (CO Tocci's Use of Taser)

A. Fourteenth Amendment Claim

Defendants seek summary judgment on Mr. Tucker's Fourteenth Amendment excessive force claim asserted against CO Tocci. Defendants argue that the undisputed evidence in the summary judgment record demonstrates that CO Tocci's use of a taser against Mr. Tucker was objectively reasonable under the circumstances as they appeared to the officer at the time he employed the complained-of force.

The Sixth Circuit has held that a corrections officer's actions in tasing a pretrial detainee, first with the taser's prongs when the inmate repeatedly refused to comply with verbal orders to go to the back of his cell, and grabbed and ripped the officer's shirt, and then by deploying an electrical charge through the taser's prongs when the inmate failed to roll over onto his stomach when directed to do so, attempted to remove the taser prongs from his body, and engaged in "escalating aggression" and "assaultive behavior," were objectively reasonable where the officer "reasonably perceived a security threat to the jail." Labadie v. Mitchell, No. 17-1290, 2018 WL 4488268, at *2-*3, 2018 U.S. App. LEXIS 12440, at *5-*7 (6th Cir. May 11, 2018); see also Clay v. San Bernardino Cty., No. ED CV 19-00032-CJC (DFM), 2021 WL 4804459, at *5, 2021 U.S. Dist. LEXIS 199220, at *14 (C.D. Cal. Sep. 8, 2021) (officer's use of a taser when faced with three non-compliant inmates "locked in combat [that] could have led to a protracted brawl" in a common area of the jail where other inmates were housed, was objectively

Fiore, 359 F.3d 24, 34 (1st Cir. 2004) (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001) for the proposition that "[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity").

reasonable where Plaintiff did not stop fighting in response to officer's three verbal commands, and Defendant did not seriously injure Plaintiff), R&R approved, 2021 WL 4806544, 2021 U.S. Dist. LEXIS 198414 (C.D. Cal. Oct. 13, 2021).

Here, the undisputed facts in the summary judgment record show that, at the time CO Tocci fired his taser, Mr. Tucker was involved in a potentially dangerous and violent incident involving other inmates and numerous corrections officers, had refused multiple commands given by officers, even after being sprayed with OC spray, and had physically pushed at least one officer. Further, it is undisputed here that CO Tocci only deployed one electric shock to Mr. Tucker. Finally, the parties agree that CO Tocci deployed the taser's electric shock only until Mr. Tucker ceased resisting officers' efforts to restrain him which, by the accounts of all parties, Mr. Tucker did immediately upon being tased.

Accordingly, the undisputed facts in the summary judgment record before the court demonstrate that CO Tocci's use of a taser against Mr. Tucker was objectively reasonable under the circumstances then present, as those circumstances would have reasonably appeared to CO Tocci. The court finds, therefore, that CO Tocci is entitled to judgment as a matter of law as to the Fourteenth Amendment excessive force claim based on his tasing of Mr. Tucker. Accordingly, the district judge should grant Defendants' motion for summary judgment on that claim.[12]

[12] Because the court finds that CO Tocci did not violate the Fourteenth Amendment when he tased Mr. Tucker, the court need not address whether CO Tocci is entitled to qualified immunity on that claim. See Flowers, 359 F.3d at 34.

B. Assault and Battery

Justification is a complete defense to any civil action in New Hampshire. See N.H. Rev. Stat. Ann. § ("RSA") 627:1. "A law enforcement officer is justified in using non-deadly force upon another person when and to the extent that he reasonably believes it necessary to effect an arrest or detention[.]" RSA 627:5. Under RSA 627:5, "reasonableness is determined by an objective standard." Simone v. Monaco, No. 20-CV-336-SM, 2022 WL 88196, at *9, 2022 U.S. Dist. LEXIS 3017, at *29–30 (D.N.H. Jan. 6, 2022) (citing State v. Cunningham, 159 N.H. 103, 107 (2009)) (other citations and internal quotation marks omitted). As discussed above, the undisputed facts in the record demonstrate that CO Tocci's use of a taser against Mr. Tucker was objectively reasonable, and justified under the circumstances as they appeared to the officer at the time he tased Mr. Tucker. The district judge, therefore, should grant the Defendants' motion for summary judgment, as to Mr. Tucker's assault and battery claim against CO Tocci, as a matter of law.

C. Respondeat Superior — Cheshire County[13]

Mr. Tucker asserts a claim for assault and battery, relating to CO Tocci's deployment of a taser against him on March 8, 2022, against Cheshire County, under a

[13] Defendants argue that they are entitled to summary judgment on Mr. Tucker's claim against Cheshire County because the respondeat superior doctrine does not apply to claims asserted under § 1983 to render a municipal employer liable for constitutional violations committed by its employees. While Defendants are correct as to that point, see Wadsworth v. Nguyen, 129 F.4th 38, 63 (1st Cir. 2025), Mr. Tucker's claim against Cheshire County, asserted under a theory of respondeat superior, relates to his claim that CO Tocci is liable to him for assault and battery under state tort law. That claim does not arise under § 1983.

theory of respondeat superior.[14] "[U]nder state law, under the doctrine of respondeat superior, an employer may be held vicariously responsible for the tortious acts of its employee if the employee was acting within the scope of his or her employment when his or her tortious act injured the plaintiff." Torres v. City of Manchester, Case No. 22-cv-93-JL, 2022 WL 17157028, at *5, 2022 U.S. Dist. LEXIS 212492, at *12 (D.N.H. Oct. 14, 2022), R&R approved, 2022 WL 17131320, at *1, 2022 U.S. Dist. LEXIS 211125, at *1 (D.N.H. Nov. 1, 2022).

Where an officer's "use of force against [Plaintiff] was justified, rather than tortious, under New Hampshire law, the [officer's municipal employer] is not liable for that use of force under [a] theory of respondeat superior." Traudt v. Roberts, Civil No. 10-cv-12-JL, 2013 DNH 094, 2013 WL 3754862, at *13, 2013 U.S. Dist. LEXIS 98363, at *41 (D.N.H. July 15, 2013). Furthermore, a municipal employer is not vicariously liable for the actions of its employees that were justified under RSA 627:5. See id. As explained above, the court finds that the undisputed facts in the summary judgment record demonstrate that CO Tocci's tasing of Mr. Tucker was justified under RSA 627:5. Accordingly, Cheshire County, as CO Tocci's employer, cannot be held liable for that conduct under a theory of respondeat superior, and the district judge should grant

[14] In its initial Order (Doc. No. 7), the court recognized, and directed service of, a claim against the CCHC (which Defendants have properly treated as a claim against Cheshire County) for assault and battery, based on theory of respondeat superior, in connection with Mr. Tucker's assault and battery claims against CO Tocci. Although Mr. Tucker's TAC does not list Cheshire County as a defendant, Defendants seek summary judgment on behalf of Cheshire County. Accordingly, the court treats the assault and battery claim as still pending against Cheshire County in this case, on a theory of respondent superior, and addresses the claim here.

Defendants' motion for summary judgment as to Mr. Tucker's respondeat superior claim against Cheshire County.

V. Claim 3 (Restraint by CSM Brown, CO Beyer, and Master Sgt. McDonald)

In Claim 3, Mr. Tucker alleges that CSM Brown, CO Beyer, and Master Sgt. McDonald used excessive force against him while they were restraining him in order to handcuff him, in violation of the Fourteenth Amendment. Defendants also move for summary judgment as to Mr. Tucker's claim that those officers, by engaging in the conduct underlying Mr. Tucker's Fourteenth Amendment claim, acted negligently.

A. Handcuffing and Positioning by CSM Brown and CO Beyer

Mr. Tucker claims that CSM Brown and CO Beyer used excessive force against him, in violation of the Fourteenth Amendment, by rolling him back onto his stomach after they had rolled him onto his side to help him to breathe, as that action increased the amount of force exerted upon him after he had stopped resisting restraint and was compliant with all of the officers' orders. Mr. Tucker also states that CSM Brown and CO Beyer, by that conduct, are liable to Mr. Tucker under a state law tort theory of negligence. CSM Brown and CO Beyer argue that they are entitled to summary judgment on Mr. Tucker's claims, as their conduct did not amount to either excessive force in violation of the Fourteenth Amendment or negligence.

It is unreasonable for an officer to increase their use of physical force upon a non-resisting, compliant person, even if that person was previously resisting efforts to restrain him. Cf. Heredia v. Roscoe, 125 F.4th 34, 47–48 (1st Cir. 2025) ("[I]t is unconstitutional for an officer to use a takedown maneuver to take an arrestee to the ground, hitting the arrestee's head on the pavement, after the arrestee had already

shown his hands and submitted to arrest."); Jennings v. Jones, 499 F.3d 2, 18 (1st Cir. 2007) (in the Fourth Amendment context, several officers acted objectively unreasonably when they increased the force they employed to restrain an individual after that individual ceased to resist arrest and advised officers that the ankle hold they were using on him was hurting his previously injured ankle); Rizzuti v. Cappabianca, 791 F. Supp. 3d 270, 314 (D. Mass. 2025) (once arrestee is "brought under control," officers' use of force should "decline accordingly"); Smith v. City of Holyoke, No. CV 17-30078-FDS, 2020 WL 1514610, at *9, 2020 U.S. Dist. LEXIS 54860, at *25-26 (D. Mass. Mar. 30, 2020) (finding it unreasonable for an officer to use significant physical force upon a non-resisting, compliant person) (collecting cases).

The undisputed evidence in the record before the court, including the video recordings, demonstrates that once Mr. Tucker was tased, he fell immediately to the ground on his back, and stopped resisting officers' efforts to detain him. The video evidence also shows that once Mr. Tucker was on the ground, CSM Brown and CO Beyer moved immediately to roll Mr. Tucker onto his stomach to handcuff him, which took twenty-two seconds to accomplish.[15] At that point, Mr. Tucker states that he told the officers he could not breathe. He claims that the officers rolled him onto his side but then, on another officer's order, rolled him back onto his stomach, thus increasing the force used against him, although he was not resisting at that time. In his deposition

[15] As discussed herein, there is some dispute in the record as to whether the officers rolled Mr. Tucker onto his stomach or Mr. Tucker complied with officers' orders to roll onto his stomach. The dispute is not material to the resolution of any issue presently before the court, and the discrepancies in the record as to that fact, therefore, do not impact the court's recommendation on summary judgment.

testimony, Mr. Tucker describes the events after CSM Brown and CO Beyer handcuffed him as follows:

> In the midst, we get on the floor. I asked Beyer if possibly he could turn me over on my side so I could breathe, because I do have asthma and a heart condition. But I asked him, could he turn me on my side so I could breathe, take a couple of breaths. He was telling me, "Hold on, Hold on. Give me a minute, Tucker."
>
> It came to a point where he finally did turn me on my side. I took like two – I tried to take two deep breaths to try to slow down, you know, my heart rate, catch my breath. And somebody yelled, "Get him on the fucking floor. Put him on the floor. Put him down on the floor." Beyer said, "Tucker, sorry, man, I got to put you back down on the floor," and he put me back down on the floor.

Tucker Dep., at 48.

The video recording of the March 8, 2022 events, however, shows that after he was handcuffed, Mr. Tucker starts to roll onto his right side, and CSM Brown and CO Beyer help him roll onto his side. The video next shows those officers assisting Mr. Tucker to a seated position. Rolling Mr. Tucker on his side and sitting him up takes approximately thirty seconds. See 76 FBLOCK Video 2:08:50-2:09:23. Parts of Mr. Tucker's body are visible on the video during that entire time, and it does not appear on the video that Mr. Tucker was placed back down on his stomach after being rolled onto his side the first time. See Scott, 550 U.S. at 380. According to the undisputed video evidence, Mr. Tucker is not placed back onto his stomach again after the officers roll him onto his side. The video evidence thus undermines Mr. Tucker's deposition testimony.

The court finds that the evidence in the summary judgment record demonstrates that Mr. Tucker was not returned to his stomach after being rolled to his side. The record does not demonstrate that CSM Brown and CO Beyer increased the amount of

force they applied to Mr. Tucker in any way after he was handcuffed. Accordingly, the undisputed facts in the summary judgment record demonstrate that the officers' conduct in handcuffing and positioning Mr. Tucker was not objectively unreasonable, and the district judge should find that Defendants are entitled to summary judgment on Claim 3, to the extent that claim asserts Fourteenth Amendment excessive force claims against CSM Brown and CO Beyer, as a matter of law. For the same reason—that the undisputed facts in the record do not demonstrate that CSM Brown or CO Beyer increased the force they used upon him after he was handcuffed—the court should grant summary judgment to those Defendants on Mr. Tucker's negligence claim.

B. Use of Leg Hold by Master Sgt. McDonald

1. Disputed Facts

Mr. Tucker states that once he was tased, and during the time he was lying on the ground on his stomach being handcuffed, he was not resisting restraint, and was complying with officers' orders. Mr. Tucker states that Master Sgt. McDonald thereafter unreasonably increased the amount of force he applied to Mr. Tucker, by grabbing Mr. Tucker's ankles, crossing his legs, bending his knees, and pushing Mr. Tucker's feet toward his buttocks, using his full weight to press on Mr. Tucker's legs.

Defendants do not dispute that Master Sgt. McDonald "applied pressure" to Mr. Tucker's legs, but maintain that the officer does not "appear to be bearing down on" Mr. Tucker's legs on the video. Master Sgt. McDonald avers that he did not put his full weight on Mr. Tucker's legs at that time. Defendants further claim that Master Sgt. McDonald's hold on Mr. Tucker's legs did not amount to excessive force because Mr. Tucker was resisting officers' efforts to restrain him before he was tased, and that

Master Sgt.'s McDonald's hold was consistent with the CCHC use of force policy.[16] Defendants refute Mr. Tucker's assertion that Master Sgt. McDonald broke Mr. Tucker's leg, and claim that Jahlil Marsh's fall into the side of Mr. Tucker's leg caused it to break, and that when Master Sgt. McDonald applied the leg hold to Mr. Tucker, he was unaware of Mr. Tucker's leg injury.

As an initial matter, the court need not decide who broke Mr. Tucker's leg to rule on the summary judgment motion with regard to Mr. Tucker's excessive force claim. Maselli v. Durden, Case No. 19-cv-1248-AJ, 2022 WL 18542272, at *5, 2021 U.S. Dist. LEXIS 263724, at *11 (D.N.H. Mar. 28, 2022) (quoting Hudson, 503 U.S. at 7 for the proposition that "[t]here is no 'significant injury' requirement to show excessive force"). Rather, the key issue for purposes of determining an excessive force claim is whether the amount of force used was objectively reasonable under the circumstances. Cf. Lachance v. Town of Charlton, 990 F.3d 14, 30 (1st Cir. 2021). While there is a genuine dispute between the parties as to what caused Mr. Tucker's leg to break, the court finds that, for purposes of summary judgment, the cause of Mr. Tucker's injury is not material to the court's determination. And, while a finding that Master Sgt.

[16] According to CCHC Superintendent Nicholas Phillips, the CCHC has "Standard Operating Procedures" that address the use of force by officers, and the CCHC's "Use of Force policy specifically prohibits the use of excess force and regulates the use of non-deadly force to defend themselves or others or to overcome a resisting subject." Phillips Decl. ¶ 8. Defendants have provided the Use of Force policy ("UFP") to which Supt. Phillips refers as an exhibit to Supt. Phillips's declaration. See Doc. No. 45-9. That UFP is dated October 1, 2024, more than two-and-a-half years after the incident underlying this action. The UFP in place on March 8, 2022, has not been provided to the court. And, while Supt. Phillips was employed at the CCHC on March 8, 2022, he was not then the facility Superintendent, and nothing in his sworn statement demonstrates that he has personal knowledge of the specific use of force training of any of the officers involved in the events of that day.

McDonald exerted enough pressure to break Mr. Tucker's leg might bear on whether the force he used was objectively reasonable, as explained below, Master Sgt. McDonald is not entitled to summary judgment on that claim on alternative grounds, and definitive proof that Master Sgt. McDonald did not cause Mr. Tucker's leg to break would not change that finding. Therefore, the court declines to consider the precise cause of Mr. Tucker's injury at this stage of the case.

The court finds that there is a genuine dispute of material fact as to whether Master Sgt. McDonald's leg hold was objectively unreasonable under the circumstances present at the time that use of force occurred. The undisputed evidence shows that when Master Sgt. McDonald conducted the leg hold, Mr. Tucker was not resisting restraint, was lying on the floor on his stomach, was complying with orders, and was already in the process of being handcuffed. See McDonald Decl. ¶¶ 5-6 (Master Sgt. McDonald "noticed Officers Beyer and Brown attempting to handcuff [Mr. Tucker]" and "went to assist them by taking control of Mr. Tucker's legs. . . . By this point, Mr. Tucker was lying on his stomach. . ..."). The undisputed facts in the summary judgment record before the court, therefore, demonstrate that Master Sgt. McDonald increased the amount of force being applied against Mr. Tucker after Mr. Tucker had stopped resisting restraint efforts for several seconds. Accordingly, a reasonable jury could find that Master Sgt. McDonald's hold on Mr. Tucker's legs was objectively unreasonable under the circumstances, and thus constituted excessive force in violation of the Fourteenth Amendment. See Jennings, 499 F.3d at 18; Rizzuti, 791 F. Supp. 3d at 314. Accordingly, the court finds that there is a genuine dispute of material fact as to whether Master Sgt. McDonald's conduct was objectively reasonable, and therefore as to

whether he used excessive force on Mr. Tucker in violation of the Fourteenth Amendment.

2. Qualified Immunity

Defendants assert that Master Sgt. McDonald is entitled to qualified immunity on the excessive force claim asserted against him in Claim 3. The court has already found that the factual allegations underlying those claims, if proven, may constitute a constitutional violation. Accordingly, the court turns to step two of the qualified immunity analysis. Under that inquiry, an officer is only entitled to qualified immunity if the constitutional violation was not clearly established at the time the underlying events took place. See Segrain v. Duffy, 118 F.4th 45, 57 (1st Cir. 2024). "Clearly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what [they are] doing is unlawful." Id. (alteration in original) (internal quotation marks and citations omitted).

That the increase in force on someone who has been restrained, is not resisting restraint, and poses no safety threat, is unconstitutional, was clearly established on March 8, 2022. See Jennings, 499 F.3d at 17 ("[T]he law was clearly established against the use of increased force on a suspect no longer offering resistance . . .."); Miranda-Rivera, 813 F.3d at 73 (denying qualified immunity claim where officers used force that injured and ultimately killed individual who was already handcuffed); Heredia, 125 F.4th at 47–48 (First Circuit precedent has been clear since 2010 that an officer cannot use a takedown method to take arrestee to the ground "after the arrestee had already shown his hands and submitted to arrest"); Raiche v. Pietroski, 623 F.3d 30, 39 (1st Cir. 2010) (holding that a "reasonable officer with training . . . would not have

needed prior case law on point to recognize that it is unconstitutional to tackle a person who has already stopped in response to the officer's command to stop and who presents no indications of dangerousness"). Because it was clearly established that increasing the amount of force on someone who was already restrained, had stopped resisting the officers' efforts to restrain him, and was compliant with officers' orders, violated the constitution at the time of the events underlying this case, the summary judgment record contains a genuine dispute of material fact as to whether Master Sgt. McDonald is entitled to qualified immunity. The district judge, therefore, should deny Defendants' motion for summary judgment as to Claim 3, to the extent that claim asserts a Fourteenth Amendment violation against Master Sgt. McDonald, and should decline to grant him qualified immunity as to that claim, at this stage of the proceedings.

3. Negligence

Master Sgt. McDonald contends that he is immune from Mr. Tucker's negligence claim pursuant to RSA 507-B.[17] Under that statute, "[n]o governmental unit shall be held liable in any action to recover for bodily injury, personal injury or property damage except as provided by this chapter or as is provided or may be provided by other statute." RSA 507-B:5. The only statutory exception to RSA 507-B:5's grant of immunity is RSA 507-B:2, which provides that "[a] governmental unit may be held liable

[17] Master Sgt. McDonald also asserts that his use of force was justified under RSA 627:5, I. However, that statute "echoes the standard for qualified immunity." Statchen v. Palmer, No. CIV. 08-CV-128-JD, 2009 WL 2997982, at *11, 2009 U.S. Dist. LEXIS 84169, at *28 (D.N.H. Sept. 15, 2009), aff'd, 623 F.3d 15 (1st Cir. 2010). Because the court already determined that Master Sgt. McDonald has not shown that undisputed facts in the record demonstrate that he is entitled to qualified immunity, he cannot point to facts in the record which demonstrate, at this stage of the case, that his use of force against Mr. Tucker was justified under RSA 627:5, I.

for damages . . . arising out of ownership, occupation, maintenance or operation of all motor vehicles, and all premises." RSA 507-B:2; see also Dichiara v. Sanborn Reg'l Sch. Dist., 165 N.H. 694, 698 (2013) ("[W]e conclude that RSA 507–B:2 provides an exception to RSA 507–B:5 only when there is a nexus between the injury and a governmental unit's ownership, occupation, maintenance, or operation of a motor vehicle or premises."). A "governmental unit" is "any political subdivision within the state including any county . . . or departments or agencies thereof." RSA 507-B:1, I. County employees, like Master Sgt. McDonald, have immunity on the same terms as the county itself so long as the employee acted (1) within the scope of the employee's official duties; and (2) with a reasonable belief that his or her actions were lawful. RSA 507-B:4, IV; Currier v. Town of Gilmanton, 621 F. Supp. 3d 233, 249 (D.N.H. 2022); Estate of Sacco v. Hillsborough Cty. House of Corr., 561 F. Supp. 3d 71, 91 (D.N.H. 2021).

There is no dispute that the first prong of the immunity analysis — that Master Sgt. McDonald was acting within the scope of his official duties — is met here. Accordingly, the court turns to the second prong of that inquiry, which requires that the employee subjectively believe that his conduct is lawful, and that the employee's subjective belief is objectively reasonable. See Farrelly v. City of Concord, 168 N.H. 430, 444 (2015).

A belief in the lawfulness of one's conduct is not objectively reasonable when the employee acts "recklessly or wantonly." Id. at 445. "[R]ecklessness is 'conduct evincing disregard of or indifference to consequences under circumstances involving danger to life or safety of others, although no harm was intended.'" Estate of Sacco, 561 F. Supp. 3d at 91 (quoting Kukesh v. Mutrie, 168 N.H. 76, 83 (2015)). "[W]anton

conduct is a willful disregard of safety or utter indifference to the consequences." Kukesh, 168 N.H. at 83 (internal quotation marks and citations omitted).

As discussed above, the court has found that Master Sgt. McDonald is not, at this stage of the proceedings, entitled to summary judgment on the issue of qualified immunity, as the undisputed facts in the summary judgment record give rise to a genuine dispute of material fact as to whether his conduct that forms the basis for Mr. Tucker's claims against him was lawful. Based on the summary judgment record before the court, there is a genuine dispute of material fact as to whether CO McDonald acted recklessly or wantonly, or disregarded, or was indifferent to, circumstances endangering Mr. Tucker's safety when he increased the amount of force used on Mr. Tucker without justification for that increase. The summary judgment record, therefore, does not support a grant of immunity to Master Sgt. McDonald at this stage of the proceedings with regard to the negligence claim asserted against him. Accordingly, the district judge should deny Defendants' motion for summary judgment as to Claim 3 to the extent it includes a negligence claim against Master Sgt. McDonald.

## Conclusion

For the foregoing reasons, the district judge should: (1) grant Defendants' motion for summary judgment (Doc. No. 45) with respect to Claims 1, 2, and Claim 3 to the extent it asserts claims against CSM Brown and CO Beyer; (2) deny that motion to the extent it asserts excessive force and negligence claims against Master Sgt. McDonald; and (3) dismiss Defendants Cheshire County, Major Erwin, CO Tocci, CSM Brown, and CO Beyer from this action. Any objections to this Report and Recommendation must be filed within fourteen days of receipt of this notice. Fed. R. Civ. P. 72(b)(2). The fourteen-

day period may be extended upon motion. Failure to file any objection within the specified time waives the right to appeal the district court's Order. See Santos-Santos v. Torres-Centeno, 842 F.3d 163, 168 (1st Cir. 2016). Only those issues raised in the objection(s) to this Report and Recommendation "are subject to review in the district court." Id. (cleaned up). Additionally, any issues "not preserved by such objection are precluded on appeal." Id.

Andrea K. Johnstone
United States Magistrate Judge

September 15, 2026

cc: Antwaun Tucker, pro se
Brian J. S. Cullen, Esq.